NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0563n.06

No. 18-5124

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Nov 07, 2018
DEBORAH S. HUNT, Clerk

REGINA AMBURGEY,

              **Plaintiff-Appellant,**

v.

COMMISSIONER OF SOCIAL SECURITY,

              **Defendant-Appellee.**

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

BEFORE:    CLAY and GRIFFIN, Circuit Judges; ZOUHARY, District Judge.[*]

    **CLAY, Circuit Judge.** Regina Amburgey ("Plaintiff") appeals the district court's decision affirming the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Social Security Disability and Social Security Income benefits (together "disability benefits"). For the reasons explained below, this Court will **AFFIRM** the district court's decision.

**STATEMENT OF FACTS**

**A. Factual and Procedural History**

**1. The Administrative Law Judge ("ALJ") Denies Plaintiff's First Application for Disability Benefits**

    Plaintiff filed an application for disability benefits on November 28, 2012. Plaintiff claimed that she had been disabled since December 31, 2008.

    The ALJ denied Plaintiff's application on August 26, 2013. The ALJ found that Plaintiff had severe physical and psychological impairments but that she did not have a single impairment

---

    [*] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

or combination of impairments that qualified as a "listed impairment." (*See* ECF No. 9-1 at PageID #222–24.) The ALJ ruled that Plaintiff did not have the ability to perform "any past relevant work."[1] (*Id.* at PageID #227.) But the ALJ found that Plaintiff was not disabled because she had the residual functional capacity ("RFC") to perform "sedentary work"[2] subject to limitations to accommodate her physical impairments. (*See id.* at PageID #224–25.) Specifically, the ALJ determined that Plaintiff could:

> lift and carry ten pounds frequently and 20 pounds occasionally; stand and walk 30 minutes at a time for a total of two hours in an eight hour day; sit for six hours in an eight hour day; occasionally push and pull with the right lower extremity and [the] right upper extremity; never crawl or climb ladders, ropes, or scaffolds; occasionally climb, stoop, kneel, or crouch; occasionally reach overhead with the right upper extremity; and should avoid exposure to [c]old, wet, humidity, or vibration. She is limited to simple, repetitive tasks in two-hour increments over a normal work schedule, and can interact appropriately with peers, supervisors, and the general public.

(*Id.*)

Plaintiff did not appeal this decision.

### 2. Plaintiff Files a Second Application for Disability Benefits

Plaintiff filed a second application for disability benefits on November 5, 2013. As in her previous application, Plaintiff claimed a disability beginning on December 31, 2008.[3] The ALJ found that *res judicata* precluded reconsideration of Plaintiff's disability claim for the period

---

[1] Despite concluding that Plaintiff lacked the ability to perform any past relevant work, the ALJ failed to identify any jobs that Plaintiff had previously held.

[2] "To determine the physical exertion requirements of work in the national economy, we classify jobs as sedentary, light, medium, heavy, and very heavy." 20 C.F.R. § 404.1567. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.* § 404.1567(a).

[3] The same ALJ presided over Plaintiff's second application.

covered by Plaintiff's first application, i.e., from December 31, 2008 to August 26, 2013, the date the ALJ issued her denial. Therefore, the ALJ construed Plaintiff's second application as claiming a disability beginning on August 27, 2013, the day after the ALJ denied Plaintiff's first application.

### a. Submitted Medical Evidence

The ALJ reviewed numerous medical and psychological records from after the ruling on Plaintiff's previous application. The ALJ separately analyzed Plaintiff's claims that she was disabled because of (1) right foot pain; (2) knee pain; (3) shoulder problems; (4) neck problems; (5) obesity; and (6) depression/anxiety. The Court will summarize the evidence that the ALJ considered in evaluating each of Plaintiff's alleged disabilities.

### i. *Physical Problems*

Right Foot Pain. Plaintiff reported that she had severe right foot problems that limited her ability to stand. But Morgan Eckerd, M.D.,[4] and Dustin Johnson, M.D.,[5] reported that Plaintiff could stand on her tiptoes and heels, and tandem walk without problems. They also found that Plaintiff could squat.[6] Dr. Eckerd stated that Plaintiff walked with a "[n]ormal" gait. (ECF No. 9-1 at PageID #860.) Dr. Johnson noted that Plaintiff had a "slightly labored" gait but reported that she had a "normal posture." (*Id.* at PageID #1129.) Dr. Johnson diagnosed Plaintiff with a mild bone spur, but stated that Plaintiff had no other significant degenerative changes in her right foot. While Plaintiff's treating physician, Ira Potter, M.D., noted that Plaintiff experienced sensory loss in her right foot with tenderness and loss of motion in her right toe, Dr. Potter reported that Plaintiff could nonetheless stand without difficulty.

---

[4] Dr. Eckerd performed a consultative examination of Plaintiff in December 2013.

[5] Dr. Johnson performed a consultative examination of Plaintiff in May 2015.

[6] Dr. Johnson reported that Plaintiff could squat with no difficulty, while Dr. Eckerd reported that Plaintiff could squat with mild difficulty.

Chih Yen, D.P.M., evaluated Plaintiff for foot pain in May 2014. Dr. Yen reported that Plaintiff had a limited range of motion in her ankles and diagnosed Plaintiff with metatarsalgia, equinus contracture of the ankle, Tailor's bunion, and rheumatoid arthritis. But Dr. Yen also noted that Plaintiff had normal bilateral muscle strength. Moreover, an x-ray of Plaintiff's right foot showed an "old" and healed fracture, mild osteoarthritis, and a small bone spur, but did not show evidence of an acute fracture or any destructive lesion or dislocation. (*Id.* at PageID #722.) Dr. Yen reevaluated Plaintiff in July 2014 and noted that while Plaintiff still experienced a "very limited" range of motion in her right ankle, she had improved by 20 percent since beginning physical therapy. (*Id.* at PageID #889.) A follow-up x-ray in September 2014 revealed no changes since May 2014.

In her January 7, 2016 decision, the ALJ found that the medical evidence did not fully support Plaintiff's alleged limitations because of right foot pain. The ALJ stated that the degenerative problems in Plaintiff's right foot were "only mild" and not worsening. (*Id.* at PageID #95.) The ALJ concluded that Plaintiff had "some limitations" in her ability to stand and walk but retained the ability to perform a "reduced range of light exertional work activity and stand and walk for two hours in a workday." (*Id.* at PageID #95–96.)

Knee Pain. Plaintiff also reported limitations because of knee pain. But Dr. Eckerd did not report that Plaintiff suffered from knee problems when she evaluated Plaintiff in December 2013. In fact, Dr. Eckerd reported that Plaintiff could rise from a sitting position, stand on her tiptoes and heels, and tandem walk without problems. Dr. Eckerd also noted that Plaintiff did not display muscle asymmetry, structural deformity, or swelling and that she could bend and squat with only mild difficulty.

Plaintiff obtained an MRI of her right knee in June 2014. The MRI was "[n]egative" except for an incidental finding of varicose veins. (*Id.* at PageID #868.) In June 2014, Dr. Potter reported tenderness and mild loss of flexion in Plaintiff's right knee but stated that she could stand without difficulty. In October 2014, Steven Carawan, M.D., evaluated Plaintiff's right knee and reported pain with palpation and crepitus. But Dr. Carawan reported no swelling or locking of the joint, and noted that Plaintiff had "[g]ood stability" in her knee. (*Id.* at PageID #1214.) Plaintiff obtained a second MRI of her right knee in November 2014 which was "[n]egative." (*Id.* at PageID #993.) Dr. Potter evaluated Plaintiff's right knee again in January 2015 and reported tenderness, crepitation, and loss of flexion.

Plaintiff began complaining of left knee pain in November 2014. Dr. Carawan diagnosed chondromalacia in Plaintiff's left knee, but an MRI revealed no meniscus tear. In December 2014, Jayalakshimi Pampati, M.D., evaluated Plaintiff for rheumatoid arthritis. Dr. Pampati found no evidence of rheumatoid arthritis and noted that Plaintiff experienced minimal joint tenderness with crepitation on range of motion.

Dr. Johnson performed a consultative examination of Plaintiff in May 2015. Dr. Johnson reported that Plaintiff had a "slightly labored gait," but noted that Plaintiff exhibited "5/5" bilateral strength in her lower extremities, had a "normal" posture, could stand on her tiptoes and heels, and tandem walk without problems, and did not use an ambulatory assistance device. (*Id.* at PageID #1129–30.)

The ALJ found that the medical evidence did not fully support Plaintiff's asserted limitations due to knee problems. The ALJ stated that Plaintiff experienced degenerative changes in her knees but that there was no evidence of advanced degeneration. The ALJ concluded that

despite her knee problems, Plaintiff could perform "a range of light exertional work activity." (*Id.* at PageID #96.)

Shoulder Pain. Plaintiff had her right rotator cuff surgically repaired in 2008. In December 2013, Dr. Eckerd noted that Plaintiff had a reduced range of motion in her right shoulder. But Dr. Eckerd reported that Plaintiff demonstrated a "5/5" bilateral grip strength with adequate dexterity and fine motor movements, and that she could grasp objects with both hands. (*Id.* at PageID #860–62.)

Plaintiff began physical therapy on her shoulders in June 2014. In July 2014, a nurse reported that Plaintiff could not raise either arm above shoulder level. In October 2014, Dr. Carawan reported that Plaintiff had a decreased range of motion in her left shoulder and that she could not raise her left arm over 90 degrees. Dr. Carawan also noted that Plaintiff reported left shoulder pain during active and passive motion and had a positive impingement sign. However, in November 2014, Dr. Carawan reported that Plaintiff had regained a full range of motion in both shoulders. He noted, however, that Plaintiff experienced some pain with full elevation and internal rotation.

Plaintiff obtained imaging of her left shoulder in the fall of 2014. An x-ray taken on October 14, 2014 indicated no fracture, dislocation, or acute osseous abnormality. But an MRI taken on November 20, 2014 indicated a partial tear of the rotator cuff tendon and bursitis and hypertrophy in the AC joint. However, Dr. Carawan reported that the MRI indicated "no significant pathology to the rotator cuff." (*Id.* at PageID #1204.)

In March 2015, Dr. Carawan reported tenderness to palpation and a limited range of motion in Plaintiff's shoulders. In April 2015, Dr. Potter noted that Plaintiff had a mild decreased range of motion and mild pain with motion in her right shoulder. In May 2015, Dr. Johnson again

observed a decreased range of motion in Plaintiff's shoulders. But Dr. Johnson reported that Plaintiff demonstrated "5/5" strength in her upper extremities, did not experience motor dysfunction, and displayed normal gross manipulation and grip strength in both hands. (*Id.* at PageID #1131.)

Plaintiff underwent surgery to repair her left shoulder in August 2015. At the post-operation visit later that month, Plaintiff reported pain in her left shoulder but was told to discontinue using a sling. It does not appear that there are any additional records about the condition of Plaintiff's left shoulder following her surgery.

The ALJ concluded that the medical record did not fully support Plaintiff's claimed impairments due to shoulder problems. The ALJ found that while Plaintiff experienced continuing problems with her shoulders, the evidence was inconclusive as to the extent of Plaintiff's limitations because some medical providers reported that Plaintiff had a reduced range of motion while others stated that she merely experienced pain. The ALJ also noted that no evidence indicated that Plaintiff had lost any strength in her upper extremities. The ALJ determined that Plaintiff could perform tasks that entailed handling, fingering, and manipulation and "a range of light exertional work activity" with limitations on climbing, reaching, and pushing and pulling. (*Id.* at PageID #97–98.)

Neck and Spine Problems. Dr. Carawan reported that Plaintiff experienced pain when bending and when extending and rotating her cervical spine. Plaintiff obtained an MRI of her cervical spine which indicated narrowing of the disc space in three vertebrae. But Dr. Johnson did not report any issues with Plaintiff's neck or spine when he performed his consultative examination.

The ALJ found that the medical evidence did not fully support Plaintiff's alleged limitations due to neck and spine problems. The ALJ noted that Plaintiff has not seen a specialist, received chiropractic treatment or injections, or undergone surgery. The ALJ concluded that Plaintiff's neck and spine issues would not prevent her from performing "a reduced range of light exertional activity." (*Id.* at PageID #98.)

Obesity. Plaintiff is obese. Nonetheless, Dr. Johnson reported that Plaintiff did not use an ambulatory assistance device, had normal posture and a slightly labored gait, and had no difficulty getting onto and off of the examination table. Plaintiff considered bariatric treatment and was approved for surgery but decided not to undergo surgery. While the doctor who authorized bariatric surgery reported that exertion caused Plaintiff to experience mild shortness of breath, Plaintiff's pulmonary function test came back normal.

The ALJ found that the medical evidence did not support Plaintiff's claimed limitations due to obesity. The ALJ further found that the restrictions imposed in the RFC sufficiently accommodated for Plaintiff's obesity.

### ii.    Mental Health Problems

Nathan Sainsbury, M.A., diagnosed Plaintiff with severe, recurrent major depressive disorder and anxiety in 2013. Plaintiff saw Sainsbury regularly through July 2014. While Sainsbury noted that Plaintiff experienced depression and anxiety throughout this period, he consistently reported that Plaintiff did not report suicidal ideations and that her "mood and psychomotor activities [are] within normal limits."[7] (*See id.* at PageID #771; *id.* at PageID #772; *id.* at PageID #774; *id.* at PageID #812; *id.* at PageID #813; *id.* at PageID #816; *id.* at PageID

---

[7] On two occasions, Sainsbury reported that Plaintiff's "mood was depressed" and that her psychomotor activities were "slow." (*See id.* at PageID #821; *id.* at PageID #826.)

#817; *id.* at PageID #818; *id.* at PageID #821; *id.* at PageID #823; *id.* at PageID #826; *id.* at PageID #827; *id.* at PageID #829; *id.* at PageID #830; *id.* at PageID #831.)

Suzette Trent, APRN, also treated Plaintiff. Plaintiff's father passed away on January 1, 2014. In her notes from Plaintiff's session two weeks later, Trent reported that Plaintiff had been feeling less depressed since she started taking a new antidepressant but that after losing her father she was more depressed than ever. But even in the months after her father's death, Plaintiff's mood and psychomotor activities were within normal limits. Moreover, in a progress note from January 29, 2014, a mental health treatment provider rated Plaintiff's depressed mood at a "4" and anxiety at a "2" on a 10-point scale, with "0" indicating "no functional impairment" and "10" indicating "severe functional impairment." (*Id.* at PageID #846.) Further, Trent reported that Plaintiff's mood improved in the months after her father's death. In April 2015, Trent reported that Plaintiff was only "somewhat depressed." (*Id.* at PageID #1182.) In September 2015, Trent indicated that Plaintiff's mood had again improved, albeit only "somewhat." (*Id.* at PageID #1184.)

Plaintiff's Global Assessment of Functioning ("GAF") scores[8] steadily improved as her treatment progressed. In November 2013, Plaintiff received a GAF score of 49.[9] Plaintiff was assessed twice during the summer of 2014 and received GAF scores of 56 on both occasions.[10] In

---

[8] "A GAF score is a 'subjective determination' on a scale of 1 to 100 'that represents the clinician's judgment of the individual's overall level of functioning.'" *Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 369 n. 1 (6th Cir. 2017) (quoting *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x. 411, 415 & n.1 (6th Cir. 2006)).

[9] "'A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) (alteration in original) (quoting *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 924 n. 1 (E.D. Mich. 2005)).

[10] "A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *Id.* (quoting *Barnhart*, 383 F. Supp. 2d at 924 n. 1).

December 2014 and April 2015, Plaintiff received GAF scores of 58. And in September 2015, Plaintiff received a GAF score of 60.[11]

Dr. Potter, Plaintiff's primary-care physician, diagnosed Plaintiff with severe recurrent anxiety and depression in June 2014. Dr. Potter also reported that Plaintiff suffered from decreased affect and decreased short-term memory. However, Dr. Potter noted that Plaintiff did not exhibit deficits in judgment or insight. Dr. Potter again reported that Plaintiff suffered from severe anxiety and depression during visits in November 2014 and January 2015, but he noted that Plaintiff did not exhibit hallucinations, delusions, or psychotic thoughts.

Claude Dotson, Psy.D., diagnosed Plaintiff with anxiety and depression in May 2015. After a follow-up appointment on September 28, 2015, Dotson again noted that Plaintiff was anxious and irritable. However, Dotson wrote that while Plaintiff reported experiencing anxiety at a level of "9.5" on a 10-point scale, she "did not have the appearance of being quite [that] anxious." (*Id.* at PageID #1597.)

The ALJ found that Plaintiff suffers from depression and anxiety. But the ALJ concluded that the medical evidence did not fully support Plaintiff's alleged disability due to mental health problems. The ALJ stated that the medical evidence indicated that Plaintiff's mental health issues improved with treatment and did not support Plaintiff's claim that she suffered debilitating panic attacks. The ALJ further stated that the RFC sufficiently accommodated Plaintiff's psychological limitations.

---

[11] The ALJ did not explicitly reference Plaintiff's GAF scores in the decision denying her application. But the ALJ presumably considered Plaintiff's GAF scores when rendering her decision. Plaintiff's GAF scores were contained in the treatment notes submitted by Sainsbury and Trent that the ALJ discussed extensively in the decision.

### b. The ALJ Denies Plaintiff's Second Application

Based on the medical evidence discussed above, the ALJ found that Plaintiff had the following severe impairments: depression; anxiety; history of foot pain, status post bunionectomy and excision of neuroma; history of knee pain; history of rotator cuff tear; obesity; cervical osteophyte complex; partial tear of left rotator cuff; and chondromalacia of left knee. But the ALJ found that none of these impairments individually or in combination equaled the severity of a listed impairment. The ALJ further found that Plaintiff "is able to perform past relevant work in small products assembly." (*Id.* at PageID #102.) The ALJ also determined that Plaintiff could perform "light work"[12] subject to certain restrictions to accommodate Plaintiff's limitations. (*Id.* at PageID #93.)

Despite determining that Plaintiff could perform relevant past work and light work, the ALJ imposed nearly identical restrictions in Plaintiff's RFC as in the decision denying Plaintiff's first application. Specifically, the ALJ found that:

> The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk for 30 minutes at a time and for two hours in an eight hour workday; can sit for six hours in an eight hour workday; can push and pull occasionally with the right lower extremity and the right upper extremity; can reach frequently with the left upper extremity in all directions; should not climb ropes, ladders, or scaffolds; occasionally can climb ramps and stairs; can occasionally stoop, kneel, and crouch; should have no concentrated exposure to coldness, wetness, humidity, or vibration; is limited to performing simple, routine tasks in two hour increments over the course of a normal 40 hour work schedule; and the claimant can interact appropriately with coworkers, supervisors, and the general public.

---

[12] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

(*Id.* at PageID #93.) The only meaningful difference is that the ALJ imposed a reaching restriction on Plaintiff's left upper extremity not present in the RFC from the first decision.

### c. Plaintiff Appeals the Denial of Her Second Application

Plaintiff appealed the ALJ's decision to the Appeals Counsel, which denied her request for review. Thus, the ALJ's decision became the final decision of the Commissioner.

Plaintiff subsequently filed a complaint in the district court. Plaintiff and the Commissioner filed cross motions for summary judgment. The district court denied Plaintiff's motion for summary judgment, granted summary judgment for the Commissioner, and affirmed the ALJ's decision. This appeal followed.

### DISCUSSION

### SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S FINDING THAT PLAINTIFF IS NOT DISABLED

### Standard of Review

"The court of appeals reviews the district court's conclusion in social security cases *de novo*, and directly reviews the [Commissioner's] findings and conclusions as if it were the first reviewing court." *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 398 (6th Cir. 2016) (alteration in original) (quoting *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)). "Appellate review 'is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.'" *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see* 42 U.S.C. § 405(g).

"Under this standard, a reviewing court must affirm an ALJ's order where it finds 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 524 (6th Cir. 2014) (quoting *Richardson v. Perales*,

402 U.S. 389, 401 (1971)). "'When deciding . . . whether substantial evidence supports the ALJ's decision, we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility.'" *Luukkonen*, 653 F. App'x at 398 (alteration in original) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Accordingly, "'[e]ven if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion [the ALJ] reached.'" *Id.* at 524 (second alteration in original) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999)); *see Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)) ("Indeed, '[i]f the [ALJ's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion.'") (alteration in original).

**Analysis**

**A. Relevant Legal Principles**

"Individuals may be eligible to receive disability insurance benefits from the Social Security Administration if they meet certain eligibility requirements." *Winn*, 615 F. App'x at 320. One requirement is for the Commissioner to determine that the individual is "disabled." *Id.*; *Keeton*, 583 F. App'x at 524. "Under the Social Security Act, 'disability' is defined as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Sorrell v. Comm'r of Soc. Sec.*, 656 F. App'x 162, 169 (6th Cir. 2016) (quoting 42 U.S.C. § 423(d)(1)(A)).

"The Commissioner employs a 'five-step sequential evaluation process' to determine whether a claimant is disabled." *Keeton*, 583 F. App'x at 524 (quoting 20 C.F.R. § 404.1520(a)(1)). Under this five-step process:

> First, plaintiff must demonstrate that she is not currently engaged in substantial gainful activity at the time she seeks disability benefits.
>
> Second, plaintiff must show that she suffers from a severe impairment in order to warrant a finding of disability. A severe impairment is one which significantly limits physical or mental ability to do basic work activities.
>
> Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.
>
> Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.
>
> For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Winn*, 615 F. App'x at 320 (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)). "The review is terminated if the Commissioner makes a dispositive finding at any stage of this inquiry." *Id.* (citing *Colvin*, 475 F.3d at 730).

"The claimant has the burden through the first four steps of either establishing a finding of 'disabled' or precluding a finding of 'not disabled.'" *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 34–35 (6th Cir. 2010) (quoting *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990)). The burden shifts to the Commissioner at step five. *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

## B. Application to the Matter at Hand

Plaintiff contends that the ALJ's decision denying her second application was not supported by substantial evidence for four reasons. First, Plaintiff argues that the ALJ improperly

revised Plaintiff's RFC from sedentary work subject to restrictions (in the decision denying Plaintiff's first application) to light work subject to restrictions (in the decision denying Plaintiff's second application) without any evidence of medical improvement, in violation of *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997). Second, Plaintiff asserts that the ALJ impermissibly altered the finding from the first decision that Plaintiff lacked the RFC to perform past relevant work, in violation of *Dennard v. Secretary of Health & Human Services*, 907 F.2d 598 (6th Cir. 1990). Third, Plaintiff claims that the ALJ inappropriately found that Plaintiff could perform light work because the ALJ imposed restrictions on Plaintiff's activities in the RFC that fall below the minimum requirements for light work and, in essence, limit Plaintiff to sedentary work. Finally, Plaintiff contends that the ALJ failed to adhere to the treating physician rule in reaching the conclusion that Plaintiff is not disabled. The Court addresses these arguments in turn.

### 1. The ALJ's Decision Did Not Violate *Drummond* Because Plaintiff's Medical Circumstances Had Improved Since the Decision on Her First Application

Plaintiff argues that the ALJ improperly revised Plaintiff's RCF from sedentary work (in the first decision) to light work (in the second decision) in violation of *Drummond*, 126 F.3d 837. (Pl. Br. at 21–22.) The Court rejects Plaintiff's argument. Contrary to Plaintiff's contention, *Drummond* does not apply here.

In *Drummond*, the plaintiff applied for disability benefits. *Id.* at 838. The ALJ found that the plaintiff had the RFC to perform sedentary work and denied the application. *Id*. Subsequently, the plaintiff filed another application. *Id.* at 839. Between the time of the first and second ALJ determinations, the plaintiff turned 50 and thus was classified as a "person approaching advanced age." *Id.* (quoting 20 C.F.R. § 404.1563(c)). This meant that the plaintiff would have been entitled to disability benefits if the ALJ again found that the plaintiff was limited to sedentary work. *Id.*

But the ALJ found that the plaintiff had the RFC to perform "medium" level work and denied the plaintiff's application. *Id.* This Court reversed. We explained that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination *absent changed circumstances*." *Id.* at 842 (emphasis added). As this Court recently noted, the problem in *Drummond* was that "[n]othing had changed between the end of the first application and the beginning of the second one—other than the advancement of one year in the applicant's age." *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 932 (6th Cir. 2018) (discussing *Drummond*, 126 F.3d 837). The first and second ALJs reviewed the same medical evidence— except for a single additional report indicating that the plaintiff's "condition actually worsened" since the decision on the plaintiff's first application. *Drummond*, 126 F.3d at 843. Because the plaintiff's medical circumstances had not changed, the Commissioner was bound by the previous finding that the plaintiff could only perform sedentary work. *Id.* Therefore, the second determination that the plaintiff could perform medium work was "not supported by substantial evidence." *Id.*

*Drummond* is inapposite. Whereas the ALJs in *Drummond* reached different conclusions about the plaintiff's RFC based on nearly identical evidence, in this case the ALJ's second decision relied on an extensive body of evidence collected after the decision denying Plaintiff's first application. Furthermore, unlike in *Drummond*, the evidence collected after the first decision indicated that Plaintiff's circumstances had improved.

For instance, the first decision gave "significant weight" to Dr. Heather O'Donnell's January 2013 examination of Plaintiff. (R. 9-1 at PageID #226–27.) Dr. O'Donnell reported that Plaintiff "was unable to squat, toe walk or heel walk," that her "[t]andem walking was limited," and that she could "perform only activities involving sitting with hands positioned at table level."

(*Id.*; *see id.* at PageID #666–67.) Dr. O'Donnell's report was the *only* objective evidence of Plaintiff's physical health that the ALJ cited in the first decision.

By the time the ALJ reviewed Plaintiff's second application in January 2016, Plaintiff had seen several additional doctors who reported significant improvement in her physical condition. Doctors Eckerd and Johnson reported that Plaintiff could stand on her tiptoes and heels, and tandem walk without problems. They also agreed that Plaintiff could squat.[13] Additionally, Dr. Johnson reported that Plaintiff could stand from a sitting position without assistance. Dr. Potter, Plaintiff's treating physician, also reported that Plaintiff could stand without difficulty. The ALJ cited these findings in the second decision.[14]

In conclusion, the ALJ did not violate *Drummond* by revising Plaintiff's RFC. *Drummond* does not apply here because substantial evidence indicates that Plaintiff's medical circumstances had improved between the ALJ's decisions on Plaintiff's applications.

### 2. The ALJ's Decision Did Not Violate *Dennard* Because the ALJ Did Not Reclassify the Exertional Demands of Plaintiff's Past Relevant Employment

Next, Plaintiff asserts that the ALJ impermissibly altered the finding from the first decision that Plaintiff lacked the ability to perform past relevant work, in violation of *Dennard*, 907 F.2d

---

[13] Dr. Johnson stated that Plaintiff could squat with no difficulty, while Dr. Eckerd reported that Plaintiff could squat with mild difficulty.

[14] While the ALJ's second decision examined the extensive evidence collected after the ALJ denied Plaintiff's first application, the second decision does not explicitly state how Plaintiff's medical condition improved from the time her first application was denied. This is presumably explained by the fact that the ALJ "concluded that the period under consideration for disability [in Plaintiff's second application] began on August 27, 2013, the day after the prior decision." (*See* R.9-1 at PageID #88.) Still, the second decision would have benefitted from an explicit discussion, similar to that provided by the Court above, about how Plaintiff's medical circumstances had changed since the ALJ denied Plaintiff's first application. However, the Court does not believe that the ALJ's failure to explicitly reference Plaintiff's original medical circumstances invalidates the ALJ's decision because substantial medical evidence collected after the ALJ's first decision indicated that Plaintiff's medical circumstances had improved. *See Drummond*, 126 F.3d at 843.

598. (Pl. Br. at 22–23.) The Court rejects this contention. As explained below, *Dennard* does not apply here.

In *Dennard*, an ALJ concluded that the plaintiff could not perform his past relevant work as a resident care supervisor, which the ALJ characterized as "heavy." *Id.* at 600. But the ALJ denied the plaintiff's application nonetheless because he found that the plaintiff had the ability to perform sedentary work and therefore was not disabled. *Id.* at 599. The plaintiff filed a second disability claim. *Id.* The ALJs who reviewed the second claim re-characterized the exertional level of the plaintiff's past relevant work as a resident care supervisor as "sedentary to light" and concluded that the plaintiff was not disabled because he could perform this past relevant work. *Id.* This Court reversed, finding that subsequent ALJs could not re-characterize the exertional requirements of the plaintiff's previous position. *Id.*; *see Kolomjec v. Sec'y of Health & Human Servs.*, 940 F.2d 660 (6th Cir. 1991) (table) (citing *Dennard*, 907 F.2d at 600) ("In *Dennard*, this court held that a prior determination by the Secretary regarding the exertional level of a claimant's past work was binding in subsequent proceedings."); *Senters v. Sec'y of Health & Human Servs.*, 960 F.2d 150 (6th Cir. 1992) (table) (citing *Dennard*, 907 F.2d at 600) (explaining that in *Dennard* this Court held that "principles of *res judicata* and collateral estoppel prevented the Secretary from reevaluating the exertional level of plaintiff's former job.").

*Dennard* is inapposite. Unlike the ALJs in *Dennard*, the ALJ here did not re-characterize the exertional level of Plaintiff's prior relevant work. In fact, the decision denying Plaintiff's first application did not provide an exertional level of Plaintiff's past relevant work or state what past relevant work experience Plaintiff possessed; it stated only that Plaintiff "is unable to perform any past relevant work." (R. 9-1 at PageID #227.) Thus, the ALJ's conclusion that Plaintiff is able to

perform past relevant work in small products assembly is not inconsistent with the ALJ's first decision. Accordingly, *Dennard* does not apply.[15]

### 3. Plaintiff's Ability to Perform Light Work Is Not Central to the Question of Whether Plaintiff Is Disabled Because the ALJ Determined that Plaintiff Could Perform Her Past Relevant Work and Alternative Sedentary Jobs

Plaintiff contends that substantial evidence does not support the ALJ's determination that she could perform light work because her RFC contains limitations that fall below the exertional requirements for light work and, in essence, limit her to sedentary work. (Pl. Br. at 23–24.) But whether Plaintiff is capable of performing light work is not central to the question of whether she is disabled. The ALJ determined that, based on her limitations, Plaintiff could perform her past relevant work and other sedentary jobs. Plaintiff is not disabled due to a physical disability if substantial evidence supports either one of these findings. *See* 20 C.F.R. § 404.1560; 20 C.F.R., Pt. 404, Subpt. P, App. 2. In that case, the ALJ's finding that Plaintiff could perform light work, even if not supported by substantial evidence, would constitute "harmless error" and would not warrant reversal. *See, e.g.*, *Keeton*, 583 F. App'x at 524 (internal citation omitted) (explaining that

---

[15] Plaintiff states that she is "bewildered" that "the same ALJ could impose *res judicata* on her earlier findings and then freely alter important elements to the detriment of the [Plaintiff]." (Pl. Br. at 23.) This argument has three fatal flaws. First, Plaintiff mischaracterizes the ALJ's invocation of *res judicata*. As explained above, the ALJ applied *res judicata* to preclude review of Plaintiff's disability *for the period of time already considered by the previous decision*. Contrary to Plaintiff's insinuation, the ALJ did not invoke *res judicata* to preclude Plaintiff from proving that Plaintiff became disabled *after* the period covered by the ALJ's first decision. Second, Plaintiff fails to recognize that the ALJ did not "alter" anything about the first decision; the ALJ conducted a *de novo* review of the time period covered by the second application and found that Plaintiff failed to meet the definition of "disabled." This distinguishes the ALJ's conduct here from the impermissible action taken by the ALJs in *Dennard*. Third, if the Court were to accept Plaintiff's argument, an ALJ reviewing a subsequent application would be precluded from reconsidering findings made by an ALJ in a previous decision, even if the applicant's medical circumstances changed between the first and second rulings. The Court declines Plaintiff's invitation to prevent ALJs from considering a claimant's changed medical circumstances when ruling on a subsequent application for disability benefits.

"even where the ALJ's decision is based on mistakes, this Court affirms those conclusions if the mistakes constituted harmless error.").

### a. Plaintiff Is Not Disabled Due if She Can Perform Past Relevant Work

At step four, the ALJ concluded that Plaintiff's impairments did not prevent her from performing her past relevant work in small products assembly. If Plaintiff can perform past relevant work she is, by definition, not disabled. 20 C.F.R. § 404.1560(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled."); *see Winn*, 615 F. App'x at 320 (quoting *Colvin*, 475 F.3d at 730) ("[I]f the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled"); *Rothacher v. Chater*, 121 F.3d 709 (6th Cir. 1997) (table) (citing 20 C.F.R. § 404.1520(3)) (explaining that an "individual capable of performing past relevant work is not disabled"). Therefore, if substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform her past relevant work in small products assembly, Plaintiff is not disabled on account of a physical disability.

### b. Plaintiff is Not Disabled if She Can Perform Alternative Sedentary Jobs

At step five, the ALJ concluded that Plaintiff has the RFC to perform the following jobs identified by the vocational expert: (1) light or sedentary monitor; (2) sedentary bench assembly, and (3) sedentary inspecting. Plaintiff does not dispute the vocational expert's testimony that these jobs exist in the national economy. These jobs are all classified as sedentary. Because Plaintiff is under 50 years old and has a high school education (*see* Pl. Br. at iv), Plaintiff is not disabled if she can perform sedentary work. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 2. Accordingly, Plaintiff is not disabled due to a physical disability if substantial evidence supports the ALJ's finding that Plaintiff has the RFC to perform the sedentary jobs identified by the vocational expert.

### 4. Substantial Evidence Supports the ALJ's Conclusion that Plaintiff Can Perform Her Past Relevant Work and Alternative Sedentary Jobs

Substantial evidence supports the ALJ's conclusion that Plaintiff can perform her past relevant work in small parts assembly. The ALJ cites to the testimony of a vocational expert who stated that, given Plaintiff's RFC, Plaintiff has the capability to perform her previous job in small products assembly.[16] Plaintiff has not cited to any evidence to rebut the vocational expert's opinion. Further, the medical evidence regarding Plaintiff's physical capabilities supports the ALJ's finding. Plaintiff testified that her position in small products assembly required her to "just sit there . . . all the parts w[ere] right there, so I had to just lift [the parts] from the table and put [them] together." (R. 9-1 at PageID #151.) Plaintiff has not identified any medical evidence that would suggest that she would struggle performing these tasks. Moreover, Plaintiff exhibited

---

[16] During the hearing, the ALJ asked the vocational expert:

Let me give you some hypothetical questions, please, and for [the] purposes of all [of] my hypothetical questions today I'd like to ask you to assume that we are discussing a worker between 42 and soon to be 46 years old, who is a high school graduate, and who has the employment history consistent with her testimony. And for the first hypothetical I'd like to ask you to assume that this worker can lift or carry 10 [pounds] on a frequent basis, 20 pounds on an occasional basis. Please assume that she can stand or walk 30 minutes at a time, for a total of two hour[s] through the course of an eight hour work day, sit for a total of six hours through the course of an eight hour work day. She can perform push/pull activities with both her left and right upper extremity on an occasional basis. She should never be expected to climb a rope, ladder, or scaffold. She can climb stairs, stoop, crouch, and crawl on an occasional basis. She can reach overhead bilaterally, but on an occasional basis only. She m[u]st avoid concentrated exposure to cold, wetness, humidity and vibrations. Please further assume that she's restricted to simple, routine, tasks [INAUDIBLE] schedule. She can interact appropriately, however, with coworkers and supervisors. And with those limitations in your professional opinion, Ms. Hale [phonetic]?

(R. 9-1 at PageID #152–53.) In response, the vocational expert stated that "[t]he small products assembly [job] would comply with that." (*Id.* at PageID #153.) The Court also notes that the vocational expert testified that based on Plaintiff's RFC, she could not perform other past relevant work, such as operating a welding machine or working as an inspector.

normal grip strength in both hands and adequate dexterity and fine motor movements. And, as the ALJ noted, no medical evidence indicates that Plaintiff had lost any strength in her upper extremities. Therefore, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff has the RFC to perform her past relevant work in small products assembly.

Substantial evidence also supports the ALJ's conclusion that Plaintiff can perform other sedentary jobs. The vocational expert testified that Plaintiff could perform three unskilled jobs at the sedentary level: surveillance monitor, sedentary or bench assembly, and sedentary inspecting. The medical evidence supports the ALJ's conclusion that Plaintiff could complete these jobs despite her limitations. Furthermore, Plaintiff does not argue that she lacks the RFC to complete any of these jobs. Accordingly, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff has the RFC to perform these alternative sedentary jobs.

In sum, substantial evidence supports the ALJ's conclusion that Plaintiff's physical limitations do not prevent her from performing past relevant work or alternative sedentary jobs. Accordingly, Plaintiff is not disabled due to a physical disability.

### 5. Substantial Evidence Supports the ALJ's Determination that Plaintiff is Not Disabled Due to Mental Health Problems

Substantial evidence supports the ALJ's conclusion that Plaintiff is not disabled due to mental health problems. Sainsbury, a clinician who treated Plaintiff over an extended period of time, consistently reported that her mood and psychomotor activities were within normal limits. While Plaintiff was severely depressed after her father passed away in January 2014, her mood and psychomotor activities remained within normal limits and a progress note from later that month rated Plaintiff's depressed mood at "4" and anxiety at a "2" on a 10-point scale, which did not indicate a severe functional impairment. (*Id.* at PageID #847.) Furthermore, in April 2015, Trent reported that Plaintiff was only "somewhat depressed," (*id.* at PageID #1182), and Trent

reported in September 2015 that Plaintiff's mood had again improved. Accordingly, as the ALJ noted, Plaintiff's anxiety and depression improved significantly with treatment and medication. Furthermore, no evidence indicates that she experienced more severe symptoms, such as hallucinations, delusions, or suicidal ideations. Finally, Plaintiff has not pointed to *any opinion* from *any* of her mental health providers that she was disabled on account of her mental health problems. Therefore, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's mental health problems did not render her disabled.

Plaintiff makes three arguments for why substantial evidence does not support the ALJ's conclusion that she is not disabled due to mental health problems. (*See* Pl. Br. at 27–28.) All lack merit.

Plaintiff first argues that the ALJ failed to consider the opinions of Dr. Leigh A. Ford, whose opinions to which the ALJ gave "significant weight" in denying Plaintiff's first application. (Pl. Br. at 26.) But Dr. Ford examined Plaintiff before the ALJ decided Plaintiff's first application, i.e., *before* the time period covered by the ALJ's most recent decision. The Court rejects Plaintiff's contention that the ALJ was required to consider the opinions of a physician who only treated Plaintiff prior to the time period at issue in her current application.

Plaintiff next asserts that the ALJ failed to mention the mental health treatment records from Kentucky River Community Care. Plaintiff is simply wrong. The ALJ discussed in detail the treatment notes submitted by Sainsbury and Trent, clinicians from Kentucky River Community Care who treated Plaintiff with ongoing psychotherapy.

Lastly, Plaintiff contends that the ALJ improperly gave "great weight" to Edward Stodola, Ph.D., a state agency mental health consultant who adopted the findings in the ALJ's previous decision that Plaintiff was not disabled due to mental health impairments. The Court finds no error

in the ALJ's approach. The ALJ did not rely exclusively on Dr. Stodola's assessment; the ALJ provided an in-depth analysis of Plaintiff's ongoing psychotherapy with Sainsbury and Trent, and also discussed Plaintiff's treatment with Dr. Potter. Further, while Dr. Stodola provided his opinion in April 2014, Dr. Stodola reviewed extensive medical records submitted after the decision on Plaintiff's first application and concluded that her mental health problems had not worsened. Finally, Plaintiff points to no evidence to support her assertion that her anxiety or depression became more severe since the ALJ's previous decision.

### 6. Plaintiff's Remaining Arguments Lack Merit

Plaintiff presents several additional arguments for why the ALJ's decision was not supported by substantial evidence. All are non-starters.

#### a. Treating Physician Rule

Plaintiff argues that the ALJ failed to give adequate weight to the "findings, records, and assessments" provided by Dr. Potter, Plaintiff's treating physician. (Pl. Br. at 29–30.) Plaintiff does not specify *which* of Dr. Potter's opinions the ALJ failed to adequately credit. However, it seems likely that Plaintiff objects to the ALJ's discounting of Dr. Potter's April 2015 questionnaire in which Dr. Potter stated that Plaintiff's physical limitations completely disabled her from engaging in substantial gainful employment. In response, the Commissioner contends that the ALJ reasonably discounted Dr. Potter's opinions because they were unsupported by objective medical evidence and inconsistent with the rest of Plaintiff's medical record. (D. Br. at 23–27.)

"Under the treating physician rule, an ALJ must give controlling weight to the opinion of a claimant's treating physician if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record . . . .'" *Winn*, 615 F. App'x at 321 (alterations in original) (quoting (20

C.F.R. § 404.1527(c)(2)). As this Court has explained, "the term 'not inconsistent' is meant to convey that 'a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion.'" *Id.* (quoting Soc. Sec. Ruling 96–2P, 1996 WL 374188 at *3 (July 2, 1996)).

"If the Commissioner determines that it will not give controlling weight to the opinion of a treating physician, it must provide 'good reasons' for its decision." *Monateri v. Comm'r of Soc. Sec.*, 436 F. App'x 434, 440 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting [a treating physician's] opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)).

The Court finds that the ALJ did not violate the treating physician rule. Several of Dr. Potter's opinions were contradicted by, or inconsistent with, substantial evidence in Plaintiff's medical record—including some of his own previous findings. Further, the ALJ provided "good reasons" for discounting Dr. Potter's opinions and explained how those reasons affected the weight given to his opinions.

Dr. Potter's opinions about Plaintiff's lifting, standing, and walking abilities were contradicted by substantial evidence in Plaintiff's medical record. For example, Dr. Potter's assessment that Plaintiff could occasionally lift ten pounds and frequently lift only less than ten pounds conflicted with Dr. Johnson's report that Plaintiff had "5/5" strength in her upper extremities and could continuously lift up to 100 pounds. (*See* R. 9-1 at PageID #1131–32.)

Similarly, Dr. Potter's conclusion that Plaintiff could stand or walk for only two hours in an eight-hour workday contradicted the evidence from Dr. Eckerd and Dr. Johnson that Plaintiff could stand on her tiptoes and heels, tandem walk without problems, and had a normal or only "slightly" labored gait. (*See id.* at PageID #860; *id.* at PageID #1130.) In fact, Dr. Potter's assessment contradicted his own previous findings; a few months earlier, he reported that Plaintiff could "stand without difficulty." (*Id.* at PageID #948; *id.* at PageID #951.) Further, while Plaintiff experienced tenderness, loss of flexion, and crepitus in her knees, MRIs of Plaintiff's right knee were negative, an MRI of Plaintiff's left knee revealed no meniscus tear, and Dr. Johnson reported that Plaintiff had a normal posture and "5/5" bilateral strength in her lower extremities. (*Id.* at PageID #1129–30.) The ALJ noted that Dr. Potter's opinions about Plaintiff's lifting, standing, and walking abilities contradicted the evidence in Plaintiff's medical record and explained that she accordingly gave "little weight" to those opinions.[17] (*Id.* at PageID #99.)

Similarly, Dr. Potter's opinion that Plaintiff could not sit for six hours in an eight-hour workday was contradicted by substantial evidence in Plaintiff's medical record. Dr. Johnson concluded that Plaintiff could perform activities involving sitting for eight hours. In fact, as the ALJ noted, *no* other evidence in Plaintiff's medical record indicated that Plaintiff had problems sitting. The ALJ explained that she gave Dr. Potter's opinion "little weight" because it was inconsistent with the rest of the medical evidence. (*See id.* at PageID #99.)

Finally, Dr. Potter reported that Plaintiff had a "moderate degree" of impairment pushing and pulling with upper and lower extremities, that Plaintiff should never climb ramps, stairs,

---

[17] Despite giving "little weight" to Dr. Potter's opinions about Plaintiff's lifting, standing, and walking abilities, the ALJ imposed restrictions on Plaintiff's lifting, standing, and walking that largely mirrored Dr. Potter's suggested restrictions. The ALJ found that Plaintiff could lift ten pounds frequently and twenty pounds occasionally, which was only ten pounds higher than the limitations recommended by Dr. Potter. Further, the ALJ found that Plaintiff could stand and walk for only two hours in an eight-hour workday—the same limitation recommended by Dr. Potter.

ladders, ropes, or scaffolds, and that her reaching abilities were limited. (*Id.* at PageID #1111–12.) These opinions conflicted with the substantial evidence that Plaintiff had normal muscle strength in her upper and lower extremities. The ALJ nonetheless gave "partial weight" to Dr. Potter's opinion because the medical evidence showed that Plaintiff had a limited range of motion in her shoulders. (*Id.* at PageID #99.) The ALJ accommodated Plaintiff's limitations by restricting her to occasional pushing and pulling with the right upper and lower extremities; preventing her from ever climbing ropes, ladders or scaffolds; and limiting her to occasionally climbing ramps and stairs. Substantial evidence supports the ALJ's decision.

In conclusion, the Court finds that the ALJ did not violate the treating physician rule because substantial evidence contradicted several of Dr. Potter's opinions and the ALJ provided good reasons for the amount of weight she gave to Dr. Potter's opinions.

### b. Plaintiff's Other Arguments

Plaintiff contends that the ALJ improperly gave "little weight" to the opinions of Russell Baker, a physical therapist who reported that Plaintiff suffers from debilitating stiffness and pain in her feet that prevents her from standing or walking for more than five minutes. (Pl. Br. at 26.) Contrary to Plaintiff's contention, the ALJ was not required to give Baker's opinion any particular weight because "a physical therapist is not recognized as an acceptable medical source." *Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 363 (6th Cir. 2001) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530–31 (6th Cir. 1997)). The ALJ considered Baker's opinion and properly explained that she afforded it little weight because the objective medical evidence did not support the severe limitations that Baker reported, specifically Dr. Johnson's finding that Plaintiff retained "5/5" strength in her lower extremities. (R. 9-1 at PageID #101.) Accordingly, the ALJ did not err by discounting Baker's opinion. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 n. 9 (6th

Cir. 2016) (citing SSR 06-03, 2006 WL 2329939, at *1 (Aug. 9, 2006)) (stating that the designation as a non-acceptable medical source "may 'justify' giving an opinion of an acceptable medical source greater weight.")

Finally, Plaintiff asserts that the ALJ improperly failed to give sufficient weight to the opinion of Dr. O'Donnell. (Pl. Br. at 26.) But, like Dr. Ford, Dr. O'Donnell only examined the Plaintiff before the ALJ decided Plaintiff's first application.

## CONCLUSION

Because substantial evidence supports the ALJ's determination that Plaitniff is not disabled due to physical or mental health problems, the Court **AFFIRMS** the district court's decision.